UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Jimmy Jones,

    Plaintiff,

    v.                                  Case No. 1:05cv193

Local 795 International Union of        Judge Michael R. Barrett
Electrical Salaried Machine and
Furniture Workers, *et al.*,

    Defendants.

## OPINION & ORDER

This matter is before the Court upon Defendant Spaulding Lighting Inc.'s Motion for Summary Judgment (Doc. 11); Plaintiff Jimmy Jones' Motion for Partial Summary Judgment (Doc. 12); Defendant Local 795 International Union of Electrical Salaried Machine and Furniture Worker's Motion for Summary Judgment (Doc. 17); Plaintiff's Motion to Strike Spaulding Lighting Inc.'s Statement of Facts (Doc. 18); Plaintiff's Motion to Strike Union's Statement of Facts (Doc. 20); Plaintiff's Motion to Strike Affidavit of Andy Beetz (Doc. 27); and Spaulding Lighting Inc.'s Motion for Oral Argument (Doc. 32).  After permitting Plaintiff to take additional discovery, this matter is fully briefed and is ripe for review.

**I.**     **FACTUAL BACKGROUND**

In April of 2001, Defendant Spaulding Lighting Inc. ("Spaulding") hired Plaintiff Jimmy Jones to work as a set-up man. (Doc. 16, Jimmy Jones Dep. at 36)  Plaintiff became a member of Defendant IUE-CWA Local 795[1] ("the Union").

---

[1]According to the Union, this is the correct name.

As a part of his orientation, Plaintiff received a copy of Spaulding's work rules, policies, and Safety Plant Rules. (Id. at 36-38) Plaintiff was aware that using abusive or threatening language, or intimidating or harassing other employees could result in the termination of his employment. (Id. at 38) Plaintiff was also aware of Spaulding's anti-harassment discrimination policy, which stated: "All employees, including those at Spaulding Lighting, must be able to work in an environment free from unwelcome sexual overtures, or other harassing acts from their fellow employees, supervisors and third parties connected with employment." (Id.; Doc. 14, Ex. 3) Sexual harassment is defined as "behavior which is sexually oriented and is not welcome; is personally offensive; negatively affects morale; interferes with the work of its victims and their co-workers; and/or creates an intimidating, hostile or offensive work environment." (Id.) Under the policy, harassment includes "[s]exually oriented jokes, remarks, cartoons, pictures, kidding, or abuse if these are personally offensive, debilitating to morale, intimidating, or act to interfere with the work of the victim;" and "physical contact or near contact such as patting, pinching, or constant brushing of a sexual nature against another's body . . ." (Id.) Violation of this policy could result in discipline "up to and including termination." (Id.) Under the policy, Spaulding's Human Resources Manager is "obligated to investigate every reported complaint of harassment, professionally and without bias, obtaining factual information and being mindful that the alleged harasser has the right to a fair and impartial hearing with a fact-based outcome." (Id.)

In 2004, Plaintiff was involved in two different incidents while at work. Plaintiff and the Defendants do not agree on the specific factual details of these events.

According to Spaulding and the Union, on August 11, 2004, Jones was involved in

an incident with another employee, Darlene Thompson. Thompson complained to Phil Green, the Union shop steward, that Jones had rubbed up against her, and threatened her. (Doc. 16, White Dep. Ex. 1; Doc. 16, Green Dep. at 29-30) Green then reported this to Greg White, Jones' supervisor. (Id.) White met with Green and Thompson. (White Dep. at 38) Thompson told White that Jones grabbed her breast and made a "nasty" remark. (Id. at 38, 45) White presented Thompson with two options: he could either report the incident to Ray Greis, Vice President of Human Resources, or White could personally settle the matter with Jones. (Id. at 39) Thompson responded that she did not want to see Jones fired, which would be the likely outcome of reporting the incident to Greis. (Id.)

White and Green then met with Jones, and explained Thompson's allegations against him. (Id. at 40) Jones admitted that he may have rubbed against Thompson's breast at the time clock and that he may have made some nasty remarks to Thompson. (Jones Dep. at 42, 44; Green Dep. at 30) White told Jones that this type of behavior would not be tolerated, and if he touched Thompson or said anything inappropriate to her, his employment could be terminated. (Jones Dep. at 46) White placed a write up regarding the incident in Jones' file. (Doc. 16, Greis Dep. at 42 & Ex. 2)

According to Spaulding and the Union, the second incident occurred six weeks later on either September 28th or September 29th. (Doc. 16, Roberts Dep. at 35) Lakesha Roberts was assigned to run a job on a machine that Jones had just finished setting up. (Id.) Roberts reported to her supervisor that Jones had attempted to grab her breasts. (Id.) Roberts explained that she told Jones that if he touched her, he would lose his job. (Id.) Roberts explained that Jones responded: "Then, I will kill you." (Id.)

According to Jones, he felt harassed by women in the workplace on many

occasions. Jones states that during the summer of 2004, Thompson had given Jones her home phone number and asked him to work on her car at her home. (Jones Decl. ¶ 25) Jones explains that he agreed and went to Thompson's house to work on the car. (Id.) Jones also states that Thompson would "come on" to him, bring him breakfast, and hug him and tell him what she wanted to do for him sexually. (Id.) Jones states that he told Thompson that he was not interested in having a relationship with her. (Jones Dep. at 41) Jones states that he attempted to explain this previous relationship to White after the incident with Thompson occurred, but White told him that he "wasn't interested in that, just stay away . . ." (Id. at 46) Jones also points to a leave of absence request that purportedly shows that Thompson was to be on vacation the week of August 11, 2004. (Doc. 14, Ex. 3)

As to the second incident, Jones disputes who told Roberts to work on the machine Jones had set up. Jones maintains that there is conflict of evidence in the record, and therefore it can be inferred that Roberts voluntarily approached Jones. Jones speculates further that Roberts purposefully initiated the contact because she wanted to get Jones fired because he had rejected Thompson, who was Roberts' best friend.

There is some minor disagreement as to what occurred after the second incident. The next day, this incident was brought to the attention of Andy Beetz, Plant Manager, Essie Jackson, Chief Union Steward, and Mike Maxwell, President of the Union. (Roberts Dep. at 42) Beetz telephoned Greis, who was working in Spartanburg, South Carolina. (Greis Dep. at 31-32) Greis began an investigation of the matter by speaking with Roberts by speakerphone. (Id. at 32-33) Roberts told her version of the events twice, and was then asked to repeat her story with Jackson present. (Id. at 38, 42) According to Gries,

Roberts' factual account remained the same. (Id. at 48)

Gries then spoke to Jones by speakerphone with Green, Jackson, Beetz present. (Jones Dep. at 59) Greis told Jones that Jackson was present because they were going to question him about an incident which could result in his employment being suspended or terminated. (Greis Dep. at 41) Initially, Jones denied anything occurred between him and Roberts. (Id. at 46) Jones then explained that he was trying to show Roberts that his hands were dirty. (Id.) Jones then changed his story, explaining that he tried to reach toward Roberts. (Id.) Finally, Jones admitted that he may have said something that Roberts misunderstood. (Id.) Jones explains these changes in his story by maintaining that the meeting occurred immediately after the incident, and it was the "pressure of surprise" which caused his "changes of story."

Greis asked Jones if he had any other confrontations with co-workers. (Jones Dep. 59) Jones told Greis about the earlier incident involving Thompson. (Id. at 60) Jones stated that he may have accidentally rubbed against Thompson's breast at the time clock. (Id. at 44) After consultation with Beetz and White, Greis informed Jones that his employment was suspended pending the outcome of Spaulding's investigation. (Id. at 60, 62)

Greis then spoke to Thompson and two other employees. (Greis Dep. 52-53) Thompson explained to Greis that Jones grabbed her breast. (Id. at 53) Thompson explained further that she had pushed Jones away, and he then pulled back and made a fist as to hit her. (Id. at 53, 61, 64) Jones disputes that any violence occurred.

Based on the information he gathered, Greis made the decision to discharge Jones. (Id. at 71) Greis informed Jones by letter that he was terminating his employment. (Jones

Dep. Ex. 5) Gries cited to the incident with Roberts, and Jones' response of a "direct threat of violence." (Doc. 14, Ex. 3) Because of Jones' previous clean record, and the Union's request for discipline short of termination, Spaulding was willing to consider re-employing Jones if he were to seek medical and/or psychological counseling and treatment. (Greis Dep. 73)

The Union also conducted its own investigation. (Doc. 16, Maxwell Dep. at 16-17) Jackson and Maxwell spoke to eleven different employees. (Id.) Jackson obtained a written statement from Roberts. (Roberts Dep. Ex. 12) Jackson also spoke to Jones regarding the incident, and asked Jones if he had said that he would kill Roberts. (Jackson Dep. at 48) Jones replied that he "might have" but that he was "playing." (Id.) Jackson also spoke to Thompson, who reiterated that Jones had touched her breast in the earlier incident. (Id. at 33) Maxwell spoke to two employees who stated that Jones had a problem with women in his work area and with the way he carried himself around women. (Maxwell Dep. at 48, 50) Jones did not deny threatening Roberts to Maxwell. (Id. at 21)

Ultimately, the Union filed a grievance on Jones behalf. (Jones Dep. Ex. 6) Jones provided a written statement which explained that he had told Roberts that his hands were "greasy and dirty," and he was going to "wipe" his "greasy hands" on her. (Jones Dep. Ex. 4) Jones also explained that he and Roberts were laughing and he told her "I would rather shoot you than put my hands on you." (Id.) Under the terms of the collecting bargaining agreement, Jones' grievance proceeded directly to Step 3 because it involved a discharge. (Greis Dep. 94) During the Step 3 meeting, Jackson urged Greis to consider a lesser discipline, citing Jones' good performance and attendance records. Jackson also suggested bringing Jones back to work in a different department. (Greis Dep. Ex. 2) Greis

denied Jones grievance at Step 3, and the grievance proceeded to Step 4. (Id.) At the Step 4 meeting, Jackson again urged Greis to consider suspension instead of discharge. (Id.) Greis declined, citing the option he provided Jones of seeking treatment as a way to get his job back. (Id.) Greis denied Jones' grievance at Step 4. (Id.)

On October 21, 2004, the Union's Executive Board met to consider whether to take Jones' grievance to arbitration. (Maxwell Dep. Ex. 3) The Board voted unanimously to not process Jones' grievance any further. (Maxwell Dep. Ex. 11)

In his Amended Complaint, Jones alleges that Spaulding permits a sexual environment to exist in the work area, whereby females are allowed and encouraged to touch male supervisors. (Doc. 2, ¶ 4) Jones alleges further that Spaulding does not discipline females for making sexual overtures to men, and fails to investigate thoroughly charges sexual harassment made by the women against the men. (Id.) Jones alleges that the Union conspired with Spaulding and "merely went through the motions" of the grievance process and did not carry out its duties in its representation of Jones. (Id. ¶ 14) Jones brings a claim against the Union under 29 U.S.C. § 159, 185 for failing to adequately represent him under the collective bargaining agreement.[2] Jones alleges that Spaulding breached the CBA by terminating him without just cause and violated Ohio Rev. Code § 4112.02(A) by terminating him because of his sex.

## II. ANALYSIS

### A. Plaintiff's Motions to Strike

Plaintiff has filed three motions to strike: Plaintiff's Motion to Strike Spaulding

---

[2]While Jones relies on both Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and Section 9(a) of the National Labor Relations Act, 29 U.S.C. § 159, in his Complaint, he appears to have abandoned the claim under the NLRA in favor of the Section 301 hybrid claim.

Lighting Inc.'s Statement of Facts; Plaintiff's Motion to Strike Union's Statement of Facts; Plaintiff's Motion to Strike Affidavit of Andy Beetz. To the extent that Jones' motions are based upon the discovery issues addressed by the Court, specifically those related to Darlene Thompson and Andy Beetz, the Court finds that Jones' motions are denied as moot. To the extent that Jones' motions are based on objections to hearsay or issues of fact, the Court will resolve those issues in its analysis of the motions for summary judgment. *See* Fed. R. Civ. P. 56(e) (requiring that statements considered in disposing of a motion for summary judgment to be "admissible in evidence" and "made on personal knowledge").

### B.   Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Once the movant has met this initial burden, the non-movant cannot rest on its pleadings, but must show that there is a genuine issue for trial. *Id.* at 324. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-480 (6th Cir. 1989).

Spaulding Lighting has moved for oral argument on its motion. The Court finds that under S.D. Ohio Civ. R. 7.1(b)(2), oral argument on this matter would not be helpful. Therefore, Spaulding Lighting Inc.'s Motion for Oral Argument is DENIED.

### C. Section 301 of the LRMA

Plaintiff has moved for summary judgment on his claim under section 301 of the Labor Relations Management Act. Defendants have also moved for summary judgment on these claims.

A hybrid section 301 action involves two constituent claims: (1) breach of a collective bargaining agreement by the employer; and (2) breach of the duty of fair representation by the union. *Garrison v. Cassens Transport Co.*, 334 F.3d 528, 538 (6th Cir. 2003), *quoting Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 583 (6th Cir.1994) (citation omitted). "Unless [the plaintiff] demonstrates both violations, he cannot succeed against either party." *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 560 (6th Cir. 1990).

#### 1. Union's Duty of Fair Representation

"A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190 (1967); *see also Motor Coach Employees v. Lockridge*, 403 U.S. 274, 299 (1971) (a plaintiff must establish by substantial evidence that the union acted arbitrarily, discriminatorily or with bad faith).

It is considered to be arbitrary if a union processes a grievance in a perfunctory manner. *Vaca*, 386 U.S. at 191. However, arbitrary actions do not include mere negligence or poor judgment. *Linton v. United Parcel Service*, 15 F.3d 1365, 1372 (6th Cir.1994). A union's actions are arbitrary only if the union's behavior is outside a "wide range of reasonableness." *Air Line Pilots Assoc. v. O'Neill*, 499 U.S. 65, 67 (1991); *Black v. Ryder/PIE Nationwide, Inc.*, 15 F.3d 573, 584 (6th Cir. 1994).

Jones makes various arguments regarding the manner in which the investigation

into the two incidents was handled, and it is not clear whether they address the Union's duty of fair representation or Spaulding's breach. Jones states that he was called into the meeting following the incident involving Roberts without knowing the nature of the meeting. Jones argues that Greis was unable to evaluate the credibility of any witnesses because he conducted his investigation over speakerphone. Jones argues that under Spaulding's written rules, Greis was required to return to Cincinnati to handle credibility questions. Jones also notes that the Spaulding representatives did not take notes during the meeting. Jones disputes that Spaulding conducted any investigation of its own, and instead maintains that Spaulding relied upon the Union's investigation. Jones argues that the Union knew that the proper investigative procedures were not being followed. Jones also maintains that the Union should not have participated in Spaulding's investigation. Finally, Jones argues that he was not given an opportunity to address or rebut the investigation conducted by Spaulding or the Union.

"To comply with its duty, a union must conduct some minimal investigation of grievances brought to its attention." *Armstrong v. Chrysler Corp.*, 972 F.Supp. 1085, 1089 (E.D.Mich. 1997), *citing Tenorio v. NLRB*, 680 F.2d 598, 601 (9th Cir. 1982). The record shows that the Union interviewed every available witness to the incidents and spoke to other employees who worked with Jones. Under the circumstances, the Union could not have done any further investigation. While there is no evidence that the Union was required to conduct an investigation separate from Spaulding, the record shows that the Union and Spaulding conducted their own investigations. In addition, as the Court reads Spaulding's complaint procedure, there is no requirement that the company hold a hearing in person. The procedure provides that the Human Resources Manager is "obligated to

investigate every reported complaint of harassment, professionally and without bias, obtaining factual information and being mindful that the alleged harasser has the right to a fair and impartial hearing with a fact-based outcome."  In summary, Jones has not pointed to "substantial evidence" which shows that the Union's investigation or processing of Jones' agreement was perfunctory, or that the Union acted unreasonably.

Jones also argues that the Union breached its duty or representation because the Executive Committee's notes do not refer to his statement or its contents.  The Court does not understand the relevance of this missing information.  Moreover, "a union does not have to process a grievance that it deems lacks merit, as long as it makes that determination in good faith." *Williams v. Molpus*, 171 F.3d 360, 366 67 (6th Cir. 1999); *see also Poole v. Budd Co.*, 706 F.2d 181, 184 (6th Cir. 1983) ("The grievance process is not expected to be error free and the courts should hesitate to interfere with legitimate internal union decisions which fairly evaluate whether a claim warrants resort to the arbitral machinery.").  Jones does not argue that the Union's decision to withdraw his grievance was made without good faith, and the Court has not found any evidence that the determination was made without good faith.

Next, Jones points out that there are some discrepancies in Defendants' materials regarding the date that the incident involving Roberts occurred.  Jones argues that this evidences a "pre-arranged, joint, Union-and-company effort to terminate" him because he was "viewed by female co-workers as: having a 'bad,' (even violent) private life; being unbelievable because he is a man against females; having an extra-marital affair with a co-worker from another department." (Doc. 19 at 3)  The Court cannot find that the discrepancies indicate that the Union acted in bad faith.  "Bad faith" has been

characterized as union actions lacking "complete good faith and honesty of purpose in the exercise of its discretion." *Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1355 (6th Cir.1989), *quoting Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 564 (1976). The discrepancies appear to be a typographical error rather than evidence of a lack of good faith and honesty of purpose. The evidence shows that Jackson urged Greis to consider a lesser discipline, and suggested that Spaulding bring Jones back to work in a different department.

Finally, Jones argues that the Union should not have raised the incident involving Thompson.[3] Jones argues that raising this incident made him subject to "double jeopardy." While the Court understands that Jones has extracted this phrase from the deposition testimony of Gries, the Court does not understand how this criminal concept has any place in this case. To the extent that Jones argues that the Defendants should have been prohibited from re-opening the Thompson "case" after the Roberts incident, the Court disagrees. While the Thompson matter was resolved between Thompson, Green, the Union, and Jones, Jones was told at the time that this type of behavior was grounds for termination. Moreover, Jones has not pointed to any prohibition against the use of this information in the CBA or Spaulding's policy and procedures.

Based on the foregoing, the Court finds that Jones has not presented substantial evidence that the Union's conduct toward him was arbitrary, discriminatory, or in bad faith. Therefore, Jones cannot maintain a claim against the Union for a breach of the duty of representation.

---

[3] According to Jones testimony, it was Jones himself who raised the earlier incident involving Thompson. (Jones Dep. at 59)

## 2. Breach of the CBA

Jones has also failed to establish that Spaulding breached the CBA by terminating his employment without just cause. Spaulding based its decision to terminate Jones on its policy prohibiting sexual harassment. Even accepting Jones' version of the events as true, Jones admitted that he tried to reach toward Roberts and that he may have said something that Roberts misunderstood. Under Spaulding's policy, near contact, jokes, remarks, and kidding can constitute sexual harassment. Spaulding also expressed concerned regarding Jones' threat of violence.

Jones appears to make two arguments that his behavior did not constitute sexual harassment. First, Jones argues that his actions did not constitute sexual harassment because he approached two different woman and only approached them one time each. Therefore, according to Jones, there was no pervasive action against one person. While this evidence may be relevant if Jones were defending against a hostile work environment claim, the Court does not understand the relevance in this case.[4] Second, Jones argues he did not violate the policy because after the incident involving Thompson, he was told to not touch Thompson again, and he did not. If this is indeed Jones' argument, the Court cannot comprehend how Jones' compliance with the warning to not touch Thompson made it acceptable to touch Roberts in an inappropriate manner.

The Court also finds that the purported discrepancies in the record Jones' has identified are of no consequence. First, Jones points to deposition testimony of Greis, which indicates that Greis' view of the incident involving Thompson may have been

---

[4] Jones cites to *Akers v. Alvey*, 338 F.3d 491, 500-501 (6th Cir. 2003) in support of its argument. This citation refers to the court's holding that Title VII does not create individual liability under § 1983 for individuals in supervisory positions. The Court cannot find any application of this holding in this case.

different had he known that Thompson invited Jones to her home to work on her car. Nevertheless, Greis testified that he knew about fixing Thompson's car before Gries made the decision to terminate Jones' employment. (Gries Dep. at 51) Second, Jones has not shown any relevance as to the day these incidents occurred, and therefore, the discrepancies in the record will not be treated as a material fact. Third, it is irrelevant whether Roberts approached Jones voluntarily. Jones does not dispute that he reached toward Roberts or that he made a comment to her. Finally, it is irrelevant whether the meeting by speakerphone was immediately after the Roberts incident, or a day later. Contrary to Jones' argument that the "pressure of surprise" caused him to change his story, details of the incident should have abundantly clear, if the event had just occurred.

Because Jones has not demonstrated a violations by the Union and Spaulding, he cannot succeed on his Section 301 claim against either party. Therefore, Plaintiff is not entitled to summary judgment on this claim, and Defendants are entitled to summary judgment.

### D. Discrimination under Ohio law

The Ohio Supreme Court has held that "federal case law interpreting Title VII of the Civil Rights Act of 1964 is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981).

A claim of employment discrimination is to be analyzed using the burden-shifting approach in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973) when there is no direct evidence of discrimination. Jones has not alleged any direct evidence of discrimination, and therefore the burden-shifting analysis is applicable.

In order to establish a *prima facie* case of discrimination, a plaintiff must show that (1) he or she is a member of a protected group; (2) he or she was subject to an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated less favorably than a similarly-situated employee outside the protected class. *Id.* at 802; *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

If the plaintiff succeeds in establishing a *prima facie* case, an inference of discrimination arises, and the burden then shifts to the defendant to articulate some legitimate nondiscriminatory reason for its actions. *Burdine*, 450 U.S. at 254-56. If the defendant articulates a nondiscriminatory reason for its actions, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons put forth by the defendant were not its true reasons but were a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802. The plaintiff may prove pretext by showing either that: (1) the proffered reason had no basis in fact, (2) the proffered reason did not actually motivate the adverse action, or (3) the proffered reason was insufficient to motivate the adverse action. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir.1994). The ultimate burden of persuading the trier of fact that the employer intentionally discriminated against her remains at all times with the plaintiff. *Burdine*, 450 U.S. at 253.

In adapting the *McDonnell Douglas* test to cases of reverse discrimination, the Sixth Circuit has held that, under the first prong, a plaintiff must demonstrate "background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63,

67 (6th Cir.1985), *quoting Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012, 1017 (D.C.Cir. 1981); *see also Zambetti v. Cuyahoga Community College*, 314 F.3d 249, 256 (6th Cir. 2002).[5] To satisfy the fourth prong, a plaintiff must show that the defendant treated differently employees who were similarly situated but were not members of the protected class. *Sutherland v. Mich. Dept. of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003).

Jones has failed to address the *prima facie* elements of his gender discrimination claim other than to proclaim that he does not need to show any evidence of reverse discrimination because he is an African-American and "the woman" is a Caucasian. Not only is the Court unsure which "woman" Jones is referring to, but the Court cannot find any support for such a proposition.

Jones' theory of discrimination is based on an unpublished decision from the Eastern District of Pennsylvania, *Curato v. Saluti*, 2000 WL 1974 (E.D. Pa. December 30, 1999). Jones argues that based on this decision, a defendant's lack of good faith investigation could itself be a form of sexual harassment. Jones argues that here, as in *Curato*, there is evidence which would have exonerated him, and a proper investigation would have revealed this evidence. Specifically, Jones points to the "the prior relationship with Darlene Thompson, etc."

Jones has not presented any evidence as to what exactly the "prior relationship" with Thompson was. There is only testimony that Jones went to Thompson's house to fix her car, and that Jones told Thompson that she was not interested in a relationship with her. In contrast, in *Curato*, there was evidence of internally-inconsistent documents, the

---

[5]It bears mentioning that the Sixth Circuit has questioned whether the "background circumstances" prong, only required of "reverse discrimination" plaintiffs, may impermissibly impose a heightened pleading standard on majority victims of discrimination. *Zambetti v. Cuyahoga Community College*, 314 F.3d 249, 257 (6th Cir. 2002).

possibility of manufactured evidence, the disappearance of evidence, and the mischaracterization of the plaintiff's statements. Therefore, unlike the Plaintiffs in *Curato*, Jones has not "cast sufficient doubt" on Spaulding's proffered reasons for the adverse employment action taken against Jones.

The Court concludes that Jones has not established a *prima facie* case, or shown that Spaulding's reasons for his termination were pretextual. Accordingly, Spaulding is entitled to summary judgment on Jones claim for employment discrimination.

### III. CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that:

1. Defendant Spaulding Lighting Inc.'s Motion for Summary Judgment (Doc. 11) is **GRANTED**;

2. Plaintiff Jimmy Jones' Motion for Partial Summary Judgment (Doc. 12) is **DENIED**;

3. Defendant Local 795 International Union of Electrical Salaried Machine and Furniture Worker's Motion for Summary Judgment (Doc. 17) is **GRANTED**;

4. Plaintiff's Motion to Strike Spaulding Lighting Inc.'s Statement of Facts (Doc. 18); Plaintiff's Motion to Strike Union's Statement of Facts (Doc. 20); Plaintiff's Motion to Strike Affidavit of Andy Beetz (Doc. 27) are **DENIED** as **MOOT**;

5. Spaulding Lighting Inc.'s Motion for Oral Argument (Doc. 32) is **DENIED**; and

6. This matter shall be **CLOSED** and stricken from the docket of the Court.

**IT IS SO ORDERED.**

          */s/ Michael R. Barrett*
          Michael R. Barrett, Judge
          United States District Court